UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                   )
FIBERLAY, INC., *et al.*,          )   Case No. C11-1441RSL
                                   )
                    Plaintiffs,    )
          v.                       )
                                   )   ORDER REGARDING DEFENDANTS'
GRACO, INC., *et al.*,             )   MOTION FOR SUMMARY
                                   )   JUDGMENT
                    Defendants.    )
_____)

This matter comes before the Court on "Defendants Graco Inc.'s and Graco Washington Inc.'s Memorandum of Law in Support of Motion for Summary Judgment." Dkt. # 24. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. L.A. Printex Indus., Inc. v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012). The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to identify specific factual disputes that must be resolved at trial. Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1059 (9th Cir. 2012). The mere existence of a scintilla of

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1  evidence in support of the non-moving party's position will not preclude summary judgment,
2  however, unless a reasonable jury viewing the evidence in the light most favorable to the non-
3  moving party could return a verdict in its favor. U.S. v. Arango, 670 F.3d 988, 992 (9th Cir.
4  2012).

    Having reviewed the memoranda, declarations, and exhibits submitted by the
parties, and taking the evidence in the light most favorable to plaintiffs, the Court finds as
follows:

## BACKGROUND

Plaintiff Robert L. Brock, through his company R.L. Brock & Associates, Inc., was a distributor for defendant Graco, Inc. Brock's compensation arrangement was not set forth in the written distributor agreements, however, and it appears that Graco calculated a commission on a project-by-project or sale-by-sale basis. As far as Brock was aware based on his twenty-plus years of selling parts and equipment for Graco and its predecessor, Brock earned a percentage commission on any standard, off-the-shelf products. If Brock were unable to close the sale himself and required technical/engineering assistance from Graco regarding design, configuration, installation, etc., he might still earn a commission, but it would be at a lower percentage. In June 2007, Graco introduced a new ordering system and commission structure. If the distributor could locate and select products from the new web program on his own, he would earn a 30% commission on the price of the component parts. If he had to call for help from Graco's engineers, the commission would drop to 15%.

In 2007, Brock learned that one of his customers, Toray Composites, was interested in building an automated resin pumping station consisting of three separate rooms. Brock brought the project to Graco, which began working directly with Toray to design a lab test for the first room setup. The initial plan was to use primarily standard, off-the-shelf products configured to meet Toray's needs. Graco informed Brock on December 5, 2007, that it "would

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -2-

like to take the PO directly into Graco Ohio for the configured system for Toray. We are going to pay 15% commission to you for the equipment for all three rooms." Decl. of Justin P. Short (Dkt. # 25), Ex. 9. As the testing for the first room proceeded, it became clear that Graco's stock products would not accomplish Toray's goals. Graco ended up customizing products and a system specifically for Toray, at a cost of $819,720 (more than four times the initial estimate).

In August 2008, Graco notified Brock that it had calculated his commission at $44,263.60, reflecting 15% on Graco products and 10% on "buyout" items. As Brock quickly pointed out, $44,263.60 represents a commission of approximately 5.35% rather than the 15% that had been promised.[1] Apparently some internal tipping point had been reached, and Graco felt that the resin room project reflected so much engineering time that it should not have to pay a commission on the value added by engineering to customize parts and systems. Graco did not

---

[1] Brock's response to the commission calculation reads:

I understand and have always understood the ten percent on buy out items. The thing that confuses me is that engineering has never been listed separately. In over twenty years of representing [Graco's predecessor] and now Graco, and of almost 100 machines sold to Boeing and others, there [have] been some sophisticated projects that have required many hours and days of engineering. IE: Boeing Seal Mix Room that spawned Boeing Witicha seal mix room, yet engineering was never separated out. Additionally much of the early and on going engineering information for the Toray Project was gathered by me.

By separating $418,671.00 out (over half of the value of the PO $827,830.00) you have cut the commission to R.L.B. to 5.35 percent instead of 15 percent less 5 percent for buy out items. The 5.35 percent does not seem reasonable when the standard finder's fee is 10 percent and R.L.B. is your authorized dealer. If not for my long standing relationship with Bill Detore at [Toray] we would not have had the opportunity.

Again I understand that Engineering was a large part of this project, but now that it (Engineering) has been done it gives Graco a decided advantage for the upgrade in Japan and new facility in France of which I will have no part . . . but was instrumental in the gathering of information.

Decl. of Justin P. Short (Dkt. # 25), Ex. 34.

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -3-

tell Toray what portion of its bill reflected the costs of engineering the component parts, however, nor had Brock ever seen a commission calculation that reduced the purchase order amount before applying the agreed-upon percentage(s). Nevertheless, Graco did so in this case, subtracting estimated engineering costs of $418,671.00 from the Toray Project purchase orders/invoices before calculating Brock's commission on the remainder.

Brock's written protestations resulted in a telephone conference with Shaun M. Cook, Graco's Director of Business Development. Cook followed up with an email on September 10, 2008, stating:

> Bob,
>
> Here is the final spreadsheet with the numbers we agreed to this morning. Please remit $2,727.13 and we will invoice $70,687.08 of which you will remit $44,506.68. We will then be finished with the two PO's from you and will await completion of the project and receipt of payment from Toray before issuing the $31,548.35 net commission due. Thanks for all your help and support.

Decl. of Justin P. Short, (Dkt. # 25), Ex. 35. The attached spreadsheet still reduced the purchase order/invoice amounts by the estimated value of the engineering added to the products, but upped the percentage commission on Graco products to 30% (from 15%) and the percentage commission on buyout items to 11% (from 10%). There is a factual dispute regarding the content of the telephone conference and the impetus behind the increased commission percentages. According to Brock, the conversation centered on the justifications for subtracting the value of Graco's engineering efforts, with Brock objecting to the adjustment and Cook making it clear that Graco was going to reduce the purchase order amounts before calculating commissions. Taking the evidence in the light most favorable to plaintiffs, one could reasonably conclude that the increased commission rates were a suitable compromise of that dispute. Cook, however, asserts that although he does not recall the telephone conversation, the reason he agreed to increase Brock's commission rates on this first room:

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -4-

> was we didn't know when the future rooms were going to happen. And I offered Bob additional money to say why don't I pay you on this one, you're going to retire at some point, I can't pay you on anything else until the jobs happen, and I'll give you additional money on this to take nothing on the future rooms. And that is what he agreed to. And maybe he's disagreeing with that. But I know that he and I agreed to that because I had no reason to go give him 30 percent, and 11.

Dec. of Justin P. Short (Dkt. # 25), Ex. D at 143. Graco subsequently issued invoices, accepted payments, and paid commissions as described in the spreadsheet attached to Cook's September 10, 2008, email.

In the fall of 2009, Brock began negotiations with Stephenson Pattern & Supply for the acquisition of R.L. Brock & Associates. Before the acquisition was completed, Fiberlay, Inc. purchased Stephenson Pattern & Supply. Brock negotiated the final terms of the sale and acquisition with Fiberlay and retired on May 1, 2010. When Toray built the second resin pumping station room, Fiberlay requested to be involved in the project. Graco reiterated its December 2007 decision to go "direct" with Toray and ultimately declined to pay any additional commission related to the three resin rooms.

Fiberlay, Brock, and R.L. Brock & Associates filed this action in August 2011. Plaintiffs assert breach of contract, misrepresentation, detrimental reliance, and Washington Consumer Protection Act ("CPA") claims against Graco, Inc. and Graco Washington, Inc. Defendants seek summary judgment on all of plaintiffs' claims.

## DISCUSSION

**A. Breach of Contract**

Plaintiffs' breach of contract claim is based on the commission agreement set forth in the December 5, 2007, email from Cook to Brock.[2] Graco argues that it reached an accord

---

[2] Because plaintiffs' breach of contract claim is based on a separate written agreement and because defendants offer no case law in support of their assertion that a distributor agreement between two corporations and/or an account receivable is a "personal service" contract, defendants' assignment

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -5-

1   and satisfaction with Brock that discharged Graco's obligation "to pay 15% commission to
2   [Brock] for the equipment for all three rooms." Decl. of Justin P. Short (Dkt. # 25), Ex. 9.
3   Under Washington law, the rules governing accord and satisfaction are as follows:

(a) To create an accord and satisfaction, there must be a meeting of the minds and an intention on the part of both parties to make a second agreement.

(b) Whether there has been an accord and satisfaction is usually a mixed question of law and fact to be determined by the Court only if there are no disputed factual issues.

(c) Because an accord and satisfaction represents a second contract, consideration is necessary. If the debtor proposes to pay only a portion of what in law he is already bound to pay, such payment by the debtor and its acceptance by the creditor do not operate as an accord and satisfaction for the entire debt, even if tendered as payment in full, because there is no consideration therefor.

(d) Where the amount of the debt or the obligation to pay is subject to a bona fide dispute, resolution of that dispute may be the consideration necessary to support an accord and satisfaction.

(e) An accord may be reached by express agreement or it may be implied from the circumstances.

(f) An accord will be implied if, in an attempt to compromise a bona fide dispute, the debtor tenders a certain sum while at the same time informing the creditor that the debtor intends the sum to be full payment and the creditor accepts and deposits the sum.

See, e.g., Kibler v. Frank L. Garrett & Sons, Inc., 73 Wn.2d 523, 525-26 (1968); Graham v. N.Y. Life Ins. Co., 182 Wn. 612, 619-21 (1935); U.S. Bank Nat. Ass'n v. Whitney, 119 Wn. App.

---

arguments are unpersuasive.

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -6-

339, 350-51 (2003).[3]

Taking the evidence in the light most favorable to plaintiffs, there are issues of fact regarding (i) whether the December 5, 2007, email accurately sets forth the entirety of the parties' agreement, (ii) the bona fides of the "dispute" that arose when Graco decided that it should not have to pay commissions on the value of the engineering that went into products sold to Toray, and/or (iii) the existence of consideration. A party's unilateral desire to renegotiate an agreement to pay generally does not give rise to an accord and satisfaction. There is also a fact issue regarding whether the parties mutually intended to compromise their dispute (*i.e.*, whether there was a meeting of the minds). Whether Brock ever expressly acquiesced in the proposed accord is disputed. If, as appears to be the case, defendants are relying on a theory of implied consent, there is limited evidence regarding how the commissions were paid and whether, at the time a lesser sum was tendered, Graco informed Brock that the sum was intended as full payment not just for the commissions owed on the first room of the Toray project, but for all three rooms. Material issues of fact remain as to defendants' defense of accord and satisfaction, and the trier of fact must determine whether the defense is applicable.

**B. Other Claims Based on Misrepresentation**

Defendants argue that plaintiffs' claims for misrepresentation, detrimental reliance, and Consumer Protection Act ("CPA") violations should be dismissed because plaintiffs have not alleged a false statement of existing fact. Defendants assert that their statements at the June 2007 conference regarding commissions for off-the-shelf systems (30%) and configured systems involving engineering support (15%) are true. Plaintiffs' tort and statutory claims are based not

---

[3] As explicitly acknowledged in Whitney, 119 Wn. App. at 351, the analysis set forth in Kibler is considerably more nuanced than the truncated statement of the law found in Evans v. Columbia Int'l Corp., 3 Wn. App. 955 (1971), on which defendants rely. In addition, the issue considered by the appellate court in Evans was whether there was a bona fide dispute regarding the amount of the debt. Neither party appealed the finding that Evans accepted the debtor's tender when he cashed a check with a conditional endorsement.

ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -7-

on the falsity of these statements, however, but on Graco's failure to disclose the existence of a third category of project – the engineered or custom system not subject to the standard commission structure – which was required to avoid misleading its distributors.

Although these claims are not subject to dismissal on the ground identified by defendants in their motion, it is apparent that plaintiffs CPA claim fails because the alleged omission does not affect the public in general. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 790-91 (1986) ("Where the transaction was essentially a private dispute . . . , it may be more difficult to show that the public has an interest in the subject matter.") (internal citations omitted). At most, other Graco distributors might have been impacted by the failure to fully disclose how commissions were calculated, but this is an internal dispute affecting a narrowly circumscribed population and is of very little, if any, interest to the public. Plaintiffs may not proceed to trial on their CPA claim.

For all of the foregoing reasons, plaintiffs' Consumer Protection Act claim is DISMISSED. In all other respects, defendants' motion for summary judgment (Dkt. # 24) is DENIED.

Dated this 20th day of December, 2012.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge